| | |
|---|---|
| **STATE OF RHODE ISLAND**<br>**PROVIDENCE, SC.** | **SUPERIOR COURT** |
| **ROBERT MOREAU,**<br>　　　*Plaintiff,*<br><br>　　vs.<br><br>**THE WOONSOCKET HOUSING**<br>**AUTHORITY, by and through its Board of**<br>**Commissioners, Chairman Michael L.A.**<br>**Houle, Vice Chairman Nicholas Gassey,**<br>**Lucienne Cote, Steve D'Agostino, and**<br>**Thomas Calouro, in their official capacities,**<br>**MICHAEL HOULE, in his individual**<br>**capacity, THOMAS CALOURO, in his**<br>**individual capacity, and the CITY OF**<br>**WOONSOCKET, by and through its**<br>**Treasurer, John Doe,**<br>　　　*Defendants.* | **C.A. No. PC 23-** |

## COMPLAINT

1.  This Complaint concerns claims arising from the employment relationship between the Plaintiff, Robert Moreau ("Plaintiff" or "Moreau") and the Woonsocket Housing Authority ("WHA" or "employer") as well as other related claims and parties.

## JURISDICTION

2. The jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983, G.L. 1956 §§ 8-2-13, 8-2-14, the Uniform Declaratory Judgments Act ("UDJA"), G.L. 1956 § 9-30-1 et seq., the Rhode Island Whistleblowers' Protection Act ("RIWPA"), G.L. 1956 § 28-50-1 et seq. and the common law.

## PARTIES

3. Plaintiff is a citizen of the United States and a resident of Rhode Island.

4. Defendant, WHA, is "a public body and a body corporate and politic," organized in accordance § 45-25-1 et seq. for the purpose of providing safe and sanitary dwelling accommodations for persons of low income.

1

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-cv-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 2 of 45 PageID #: 5

5. Defendant, Michael L.A. Houle ("Houle"), is a Commissioner and Chairman of the WHA and is sued in both his individual and official capacities.

6. Defendant Houle is also currently employed by the City of Woonsocket as part-time Director of Human Services.

7. Defendant, Nicholas Gassey ("Gassey"), is a Commissioner and Vice-Chairman of the WHA and is sued in his official capacity only.

8. Defendant, Lucienne Cote ("Cote") is a Commissioner of the WHA and is sued in her official capacity only.

9. Defendant, Steven D'Agostino ("D'Agostino") is a Commissioner of the WHA and is sued in his official capacity only.

10. D'Agostino is currently employed by the City of Woonsocket as Director of the Department of Public Works.

11. Defendant, Thomas Calouro ("Calouro") is a Commissioner of the WHA and is sued in both his official and individual capacities.

12. Calouro is also employed by the City of Woonsocket Police Department and holds the rank of Deputy Chief of Police.

13. Defendant, City of Woonsocket ("City"), is a municipal corporation and is sued by and through its Treasurer, John Doe, the person designated by state law to be named in a suit against the City. G.L. 1956 § 45-15-5.

14. By state law, the Mayor of the City appoints the WHA Commissioners.

15. The Mayor has no statutory supervisory authority over the management or operation of the WHA.

16. At all relevant times, the Mayor of the City was Lisa Baldelli-Hunt.

## ADMINISTRATIVE PROCEDURES

17. Pursuant to G.L. 1956 § 45-15-5, the Plaintiff has mailed a notice of claim and demand to the City Council prior to filing this action.

## STATEMENT OF FACTS

*Background*

18.　　From about 1986 to 2009, Moreau was employed by the City Police Department, retiring at the rank of Lieutenant.

19.　　During his twenty-five years with the Police Department, Moreau had never been disciplined and had satisfactory job performance.

20.　　As a police officer, Moreau was a member of the International Brotherhood of Police Officers, Local 404 (hereinafter "Police Union").

21.　　At various times, Moreau served on the Police Union Executive Board.

22.　　Following his retirement from the Police Department, on or about April 20, 2009, Moreau was hired by the WHA as Director of Security.

23.　　The WHA is governed by a Board of Commissioners ("Board" or "Commissioners") which has certain statutory powers and obligations under state law.

24.　　The WHA is led by an Executive Director who is responsible for the day-to-day management of the WHA and who reports to the Board.

25.　　The WHA is subject to certain regulatory oversight by the United States Department of Housing and Urban Development ("HUD").

26.　　In or about 2015 or 2016, Moreau's duties and responsibilities increased when he took on the role of Director of Maintenance in addition to the Director of Security position.

27.　　During the time Moreau was employed in the positions of Director of Security and Director of Security/Director of Maintenance, Moreau reported to two different Executive Directors.

28.　　During the time Moreau was employed in the positions of Director of Security and/or Director of Maintenance, he was a member of Teamsters Local 64 ("Teamsters Union").

29.　　During the time Moreau served as Director of Security and/or Director of Maintenance, he was not disciplined in any manner and did not receive any negative performance evaluations.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-cv-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 4 of 45 PageID #: 7

30.     During the time Moreau served as Director of Security and/or Director of Maintenance, Moreau received pay increases pursuant to applicable Collective Bargaining Agreements ("CBA") and/or other wage increases not governed by the CBA.

31.     In or about June 2018, then-WHA Executive Director Christine O'Connor was placed on leave from her position.

32.     On or about June 29, 2018, the Board appointed Moreau Interim Executive Director.

33.     In or about August 2018, the Board was notified that HUD's Office of Inspector General ("OIG") was to conduct an audit into certain WHA compliance matters that pre-dated Moreau's appointment to the position of Interim Executive Director.

34.     Specifically, the OIG was to determine whether the WHA administered its Capital Fund program in accordance with HUD's requirements or regulations and/or WHA policy.

35.     To conduct the audit, OIG officials spent many hours at the WHA offices working with Moreau, and Executive Assistant/Human Resources Director Katrina Lapierre ("Lapierre") to review documents and conduct other investigative work related to the audit.

36.     Moreau requested that Lapierre assist with the work for OIG and later on the proposed corrective action plan.  As a result, Lapierre's job responsibilities increased.

37.     The Board was aware of Lapierre's role in assisting OIG with the audit, because, among other things, she regularly updated the Board on the progress of the OIG audit and the work that both she and Moreau were doing.

38.     Separate from the OIG audit, the WHA has its financial data audited on an annual basis by an independent auditor.

39.     At all relevant times, the WHA's annual audit was conducted by Marcum LLP.

40.     Upon information and belief, Marcum traditionally does not work at the direction of the Chairman of the WHA.

41.     The WHA also employs an outside accountant to assist the WHA.

42.     At all relevant times the outside accountant was Theresa Ewald, CPA from the firm Fenton, Ewald & Associates.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-cv-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 5 of 45 PageID #: 8

43.    Pursuant to accepted practice and procedure, when the FY 2017 audit was completed by Marcum, Marcum shared its findings with HUD.

44.    Pursuant to accepted practice and procedure, after review of the Marcum audit, HUD communicates recommendations or corrective actions to the WHA for it to implement to ensure consistency with HUD practices or regulations.

45.    At all relevant times, HUD and the WHA had policies and regulations that governed the procurement activity of the WHA.

46.    Historically, the procurement policy and procedure were administered by a Deputy Executive Director at WHA.  However, in 2015, that position was eliminated and the responsibilities were transferred to the Procurement Officer.

47.    Accordingly, the then-Procurement Officer, Susan Castrataro ("Castrataro"), was responsible for ensuring compliance with HUD regulation and WHA procurement policy.

48.    The FY 2017 Marcum audit revealed a deficiency in the area of procurement.

49.    To resolve the procurement issue that was identified by Marcum relative to the FY 17 audit, HUD recommended that additional internal controls be implemented to avoid repeating the same issue.

50.    New and/or additional procedures or internal controls relative to procurement policy were implemented in about September 2018 while Moreau was Interim Executive Director.

51.    Neither Moreau, O'Connor or Castrataro, were subject to investigation (either internal or external) as a result of the deficiency that was identified by Marcum.

52.    HUD was satisfied that the updated procurement procedures addressed the deficiency in the FY 2017 audit.

53.    In December 2018, O'Connor resigned.

54.    Upon information and belief, O'Connor's resignation was not directly or solely related to Marcum's FY 2017 audit findings.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-cv-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 6 of 45 PageID #: 9

*Moreau's Employment as Executive Director*
*through December 31, 2019*

55.    On December 27, 2018, the Board unanimously approved and executed an employment contract with Moreau for the permanent position of Executive Director (the "First Employment Contract"). Appendix A, *First Employment Contract.*

56.    The position of the Executive Director is a non-Union position.

57.    Pursuant to the minutes of the December 27, 2018 WHA meeting, the Board was pleased with Moreau's performance over the initial six-months that he held the position of Interim Executive Director.

58.    The First Employment Contract executed by Moreau and the Board provided for an initial term of employment of three (3) years. App. A, § 1.

59.    The First Employment Contract included a provision that allowed for the contract of employment to be extended that reads: "[t]his agreement shall automatically renew for an additional twenty-four (24) months unless WHA provides 90 day written notice before expiration of three-year agreement." App. A, § 1.

60.    The WHA's legal counsel received a draft proposed contract in advance of the meeting and was present at the meeting during which the Board considered whether to agree to the terms of the First Employment Contract with Moreau.

61.    Following the approval of the First Employment Contract, the Mayor appointed the City's Director of Public Works (i.e., a City official), D'Agostino, to the position of Commissioner.

62.    Following the execution of the First Employment Contract, the issue of Moreau's employment contract was again placed on the Board agenda for discussion at the January 31, 2019, meeting.

63.    Upon information and belief, the placement of the issue of Moreau's employment contract on the agenda in January 2019 was based on a request by the Mayor to one or more Commissioners.

64.    Upon information and belief, the Mayor met individually with various Commissioners to discourage them from appointing Moreau as Executive Director.

65.    The Mayor has no authority to select WHA employees.

6

66.     The Mayor's desire that the Board not appoint Moreau was not based on merit.

67.     At the January 2019 Board meeting, the Board revisited the First Employment Contract and re-voted.

68.     D'Agostino, who was also employed by the City, voted against the First Employment Contract.

69.     Six other Commissioners voted (again) in favor of the First Employment Contract, and thus, Moreau remained in the position under the terms of the First Employment Contract.

70.     The WHA had legal counsel present at its meeting during which it considered whether to agree to the terms of the First Employment Contract for a second time in January 2019.

71.     With respect to both the December 2018 and January 2019 votes by the Board, the decision regarding Moreau's employment as Executive Director and the decision to enter into the contract were not considered as separate issues or votes.

72.     The Board voted to approve the First Employment Contract which also served as the appointment decision.

73.     By the terms of the First Employment Contract, the agreement "supersede[s] all prior Employment Contracts between WHA and Employee." App. A, § 1.

74.     Pursuant to the First Employment Contract, either party could request "semi-annually, or at any such time determined to be in the best interest of WHA, discuss the job performance of [Moreau], the working relationship between [Moreau] and WHA, *and this employment contract.*" App. A, § 1 (emphasis added).

75.     Thus, nothing prevented the parties from reconsidering the terms of the First Employment Contract at any time, in fact, that concept was specifically contemplated by the parties and included in the First Employment Contract.

76.     If the parties desired to make any changes to the First Employment Contract it provided that it could be amended so long as it was done so in writing and executed by both the Board and Moreau.  App. A, § 14.

77.     Pursuant to the First Employment Contract, Plaintiff's salary was set at $122,200 with a 3 percent increase each year of the contract.  App. A, § 3.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

1:23-cv-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 8 of 45 PageID #: 11

78.     Pursuant to the First Employment Contract, Plaintiff Moreau was entitled to a number of employee benefits such as a WHA vehicle, health insurance, paid vacation, paid sick leave, paid personal days, travel allowances, bereavement leave, pension benefits and "to the extent not set forth herein, [Moreau] shall be entitled to any employee benefits contained in the personnel policy of WHA that are not inconsistent with the above." App. A, § 4.

79.     By the terms of the First Employment Contract, Moreau's employment could be terminated in a number of ways such as by mutual agreement, retirement or death of the employee, voluntarily by the employee with notice or for cause.

80.     Pursuant to the First Employment Contract, the separation pay and benefits to which Moreau was entitled depended on the circumstances upon which his employment was separated.  App. A, § 6.

81.     The First Employment Contract contained several provisions affording Plaintiff Moreau specific contractual due process rights prior to dismissal.  App. A, § 6.

82.     Prior to the presentation of the First Employment Contract at both meetings, Moreau did not meet with the Commissioners individually or collectively to discuss in detail the terms of the First Employment Contract.

83.     On February 1, 2019, then-Chairman Dubois wrote to HUD Director Marilyn O'Sullivan at the Boston Regional Office informing her that the Board appointed Plaintiff Moreau as its Executive Director.

84.     Upon information and  belief, Director O'Sullivan did not notify then-Chairman Dubois that HUD required that the Board submit any Employment Contract with Moreau to HUD for its review or approval.

85.     Upon information and belief, HUD was not involved in the review or approval of the First Employment Agreement, because in fact, HUD does not require review or approval of such agreements.

86.     The OIG audit continued into 2019. In about February 2019, OIG officials finished the on-site work.

87.     The procedure of the OIG is that after concluding an investigation, it issues a draft report and provides it to the agency in order to give the agency an opportunity to respond to the information in the report before it becomes final.

88.     The OIG issued its draft report.

8

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

1:23-cv-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 9 of 45 PageID #: 12

89.     The draft report found that the WHA did not always comply with the Capital Fund Program and Procurement Requirements.

90.     With respect to the Procurement Requirements cited by OIG, the OIG noted that the failures of the WHA were because "[a]uthority officials did not have adequate policies and procedures or always follow them to ensure that procurement and contract administration requirements were met, including documenting the complete history of the procurement."

91.     As a remedy, the OIG recommended that certain federal funds be re-paid, and to "[s]trengthen their policies and procedures to address the procurement and contract administration deficiencies identified."

92.     At the time the OIG issued its draft report, the Procurement Department at the WHA was still led by Castrataro.

93.     Following the issuance of the draft OIG report, citing issues with officials following procurement policy and regulation, no investigation commenced into any employees involved, nor was Moreau subject to investigation.

94.     No employee was dismissed or disciplined as a result of any violation of any HUD procurement regulation cited in the audit.

95.     Moreau was not held responsible for the deficiency of any subordinate or for his failure to ensure that procurement policy was always followed.

96.     On or about April 18, 2019, the Procurement Policy was updated.

97.     On or about April 25, 2019, Moreau responded to the OIG draft report.

98.     In the response, Moreau pointed out that there was no finding that the WHA used any federal funds illegally, immorally or unnecessarily on any project.

99.     Moreau wrote to HUD that all projects undertaken were completed and met all codes and regulations.

100.    Moreau wrote to HUD that no funds were misappropriated.

101.    Moreau advocated that the WHA had no obligation to repay any federal funds to HUD.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA     Document 1-1     Filed 10/06/23     Page 10 of 45 PageID
#: 13

102.     With respect to the procurement issues, Moreau defended the WHA's decision to move forward with a particular project after receiving only one bid and noted that steps were taken to improve procurement policy.

103.     In May 2019, the HUD OIG issued its final report concerning the audit.

104.     In its final report, the OIG confirmed its draft findings.

105.     As part of the OIG audit, the OIG reviewed annual financial statements for the fiscal years 2015, 2016 and the draft fiscal statements for 2017 as well as the Annual Statement and Performance Evaluation Reports from 2013 through 2018.

106.     Despite reviewing all the materials identified in Paragraph 105 and having complete access to WHA records and practices over a period of  many months, OIG did not find any wrongdoing on the part of Moreau, nor did it identify any performance issues with Moreau or any issues with the WHA budget, pay raises for any employees or Moreau's First Employment Contract.

107.     HUD did not recommend or initiate any investigation into any employee as a result of its findings.

108.     The then-Commissioner of the Board did not initiate his own investigation into any employees.

109.     As part of the procedure, the WHA, through Moreau, submitted a formal corrective action plan to HUD.

110.     The point of such corrective action plan is to propose a way to cure deficiencies and to avoid repayment of federal funds or other financial penalties.

111.     The WHA's fiscal year was based on the calendar year.

112.     As of May 2019, the Board had not yet approved a budget for FY 2019.

113.     At the time, the Finance Department had no Director, but was being managed by Joanne Lanoue ("Lanoue"), an accountant.

114.     The Board was fully aware of the reasons for the delay in completing and submitting the budget and did not communicate to Moreau that it was any type of disciplinary or performance issue on the part of Moreau or anyone else.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 11 of 45 PageID #: 14

115.    In other words, Moreau was not held responsible for the inability to hire a Finance Director or the lack of a timely prepared budget.

116.    The Board acted without a budget for 2019 between January and June 2019, which meant a variety of expenditures were made, and bills paid, which were not part of any budget approved by the Board.

117.    The Board and Moreau reviewed and approved all expenses on a monthly basis.

118.    In addition, the outside fee accountant balanced the books on a monthly basis.

119.    At the time, Moreau was authorized to spend up to $25,000 per purchase without Board approval.

120.    In March 2019, Plaintiff Moreau approved a salary increase for the Director of Human Resources/Executive Assistant, Lapierre.

121.    Moreau considered the additional OIG audit related work LaPierre had been doing and that her salary was low as compared to the salary previously paid to at least one prior Director of Human Resources.

122.    The increase brought Lapierre's salary from $70,073 to $87,997, an annual increase of less than $20,000.

123.    In about May 2019, Plaintiff Moreau approved a salary increase for Security Facilitator, Tracy Maynard.

124.    Maynard had assumed some of the duties of Assistant Director when Biron was promoted to fill Plaintiff Moreau's vacancy in June 2018 without additional compensation.  The increase brought Maynard's salary from $42,452.80 to about $59,342.00, an annual increase of less than $15,000.

125.    In October 2019, Moreau approved a salary increase for the Director of Security, Roger Biron, based on the fact that his position had changed.  The increase brought Biron's salary from $59,011.68 to $67,100.18, an annual increase of less than $10,000.

126.    This increases for Biron and Maynard were separate from, and additional to, the contractual increases that they were entitled to by virtue of their union membership.

127.    Lapierre was a non-union employee.

11

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 12 of 45 PageID #: 15

128.   Moreau had authority to grant raises to employees, including LaPierre, Maynard and Biron.

129.   Moreau obtained no personal benefit by virtue of granting raises to these employees.

130.   The WHA had the funds to pay the raises.

131.   The raises were in accordance with comparable salaries for comparable work.

132.   The raises were not a secret.

133.   The salary changes were recorded by Human Resources and transmitted to the Finance Department which then paid the new salaries, retroactive to January 1.

134.   The Finance Department was responsible for reflecting the appropriate salaries in the budget, when prepared.

135.   The change to the salaries was known not only to Moreau, but to Lapierre in Human Resources and to those in the Finance Department who had to implement the changes.

136.   The Union representing Maynard filed a grievance contesting the increase as in excess of what the CBA permitted.  In response to the grievance, Moreau reduced Maynard's salary as requested by the Union.

137.   The Teamsters Union (representing Biron) did not file a grievance.

138.   The Chairman of the Board, Richard Levesque ("Levesque"), was aware of the grievance and as well as a request for information by the Union about salaries.

139.   At no time did Levesque (or any other Board member) or the WHA Attorney indicate to Moreau that he lacked the authority as Executive Director to adjust salaries in the manner described herein.

140.   In or about April or May 2019, Moreau recruited former Finance Director, Steven Marino, to return to work for WHA.

141.   Accordingly, in June 2019, the budget was finally prepared and submitted to the Board for its consideration.

142.   A budget is an estimate or prediction of annual costs which may or may not be met.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA     Document 1-1     Filed 10/06/23     Page 13 of 45 PageID #: 16

143.    The Board approved its budget for the calendar year 2019 at its June 10, 2019 meeting.

144.    In doing so, the Board approved a budget for salaries and benefits in the amount of $5 million dollars.

145.    In or around June 2019, Lanoue announced her retirement and subsequently retired.

146.    Marino left the position of Finance Director shortly thereafter.

147.    Moreau proposed to re-hire Lanoue on a part-time basis to which she agreed.

148.    Lanoue returned part-time in October 2019, but the Finance Department was still short-staffed and again lacked a Director.

149.    Lanoue was no longer a union member and Moreau had the authority to set her salary.

150.    The Board was aware of the circumstances of re-hiring Lanoue and the terms under which she was re-hired.

151.    Throughout 2019, Moreau continued to work with HUD (and WHA staff including Lapierre and Castrataro) to address the deficiencies identified by the OIG as part of the corrective action plan.

152.    In October 2019, HUD wrote to Moreau concerning its review of Marcum's 2018 annual audit.

153.    HUD noted that Marcum found a procurement issue.  The issue, however, had been carried over from 2017 and was already the subject of a prior corrective action plan.

154.    The particular issue related to an expense that exceeded $150,000 for computer related services.

155.    Although Marcum identified this as an issue, HUD informed Moreau that it was satisfied that based on prior discussions "the information provided to us in Woonsocket's Corrective Action Plan regarding the prior year finding 2017-001 addresses the issue."

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA      Document 1-1      Filed 10/06/23      Page 14 of 45 PageID #: 17

156.    HUD acknowledged that the September 2018 procurement changes were still acceptable but since the matter was carried forward, WHA should reaffirm in writing that it does not anticipate any additional findings on this issue.

157.    In November 2019, Moreau wrote to HUD, describing the procurement process as follows:

"On a *monthly basis*, using a report generated from the accounting system of record, the Procurement Officer reviews all YTD vendor payments *and identifies any single vendor who has aggregated purchases at or approaching $3,000, the current competitive procurement threshold*.  The Procurement Officer compares this list of vendors against the agency's contract register to identify frequently used vendors who may warrant individual contracts, or determine if they qualify under the State of RI Master Price Agreement ("MPA").

The Procurement Officer publishes this list to all employees who have the authority to make purchases, *reminding them of their responsibilities to collect three pricing quotes for vendors appearing on this list*.  These quotes must be attached to the requisition prior to purchasing any items.  The only exception to the rule is when the situation is an emergency of life, health or safety.  The emergency must be documented on paper and attached to the requisition.

This internal control was adopted in October 2018." (emphasis added).

158.    Marcum did not report any other outstanding deficiencies in WHA's financial matters from 2018.

159.    On December 19, 2019, the Board held a regularly scheduled meeting.

160.    Prior to the meeting, more than one Commissioner approached Moreau to discuss a new employment contract.

161.    The Commissioners who approached Moreau did so for the purpose of ensuring his continued employment for a period longer than the two years remaining on the First Employment Contract.

162.    Revisiting the First Employment Contract was a concept provided for expressly in the agreement itself.

163.    Accordingly, Moreau proposed a new Employment Contract for the Board's consideration at the December 19 meeting (the "Second Employment Contract"). Appendix B, *Second Employment Contract.*

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 15 of 45 PageID
#: 18

164.    Prior to the meeting, Plaintiff Moreau did not meet with the Commissioners individually or collectively to discuss in detail the terms of the Second Employment Contract.

165.    Prior to the meeting, the contract was shared with the Board's attorney.

166.    Upon information and belief, the Board's attorney did not identify any problems with the terms of the proposed Second Employment Contract.

167.    The decision to enter into a new contract and whether to agree to the terms in the contract was entirely up to the Board.

168.    If the Board decided not to enter into a new agreement, Moreau would be employed for a minimum of another two years under the First Employment Agreement.

169.    If the Board decided to enter into the Second Employment Agreement, then Moreau would be employed for a minimum of another three years.

170.    The minutes reflect that the Board entered executive session to consider the "annual job performance of the WHA's Executive Director as it relates to his current Employment Contract with the WHA and its modification and/or renewal * * *."

171.    Pursuant to the Executive Session minutes, the Board's Attorney:

> "distributed a copy of the proposed employment contract to all members of the Board to review and discuss. [The attorney] discussed the employment contract stating, as asked by Commissioner D'Agostino, that the contract is legal and is properly noted on the agenda for the Board to vote on it if it so chooses. The salary is a three percent increase from the Director's current contract.  In addition, there were some language changes that were removed from the current contract as it was unnecessary and subjective regarding a WHA opportunity.  Commissioner Dubois asked if this contract was an extension of his current contract or a new contract. [The Attorney] stated that this was a new contract with a right to renew.

> [The Attorney] also stated that he has worked with the Director on the WHA's legal matters & contract negotiations and that he believes Director Moreau to be honest and fair and has brought comradery and transparency to the WHA.

> Commissioner Dubois stated that he will be voting to approve the employment contact with Director Moreau as he has been very impressed with the Director's leadership and his handling of the OIG/HUD audit and to the Director's quick response to the Board's questions and concerns."

172.   During the meeting, Moreau gave a "detailed overview of his first year as Executive Director" outlining his accomplishments, one of which was achieving he certification of Certified Manager Executive from HUD in 2019.

173.   Accordingly, the Board voted unanimously to accept the Second Employment Contract and executed the same. App. B.

174.   The Board did not vote on Moreau's employment status as Executive Director separate from approval of the Second Employment Contract.

175.   Pursuant to the Second Employment Contract, either party could request "semi-annually, or at any such time determined to be in the best interest of WHA, discuss the job performance of [Moreau], the working relationship between [Moreau] and WHA, *and this employment contract*." App. B, § 1 (emphasis added).

176.   Thus, nothing prevented the parties from reconsidering the terms of the Second Employment Contract at any time, in fact, it was specifically contemplated by the parties and included in the Second Employment Contract.

177.   Pursuant to the Second Employment Contract if the parties desired to make any changes, the contract provided that it could be amended so long as it was done so in writing and executed by both the Board and Moreau.  App. B, § 8.

178.   Pursuant to the Second Employment Contract, Moreau's salary was set at $125,660 with a 3 percent increase each year of the contract.  App. B, § 3.

179.   Pursuant to the Second Employment Contract, Moreau was entitled to a number of employee benefits such as a WHA vehicle, health insurance, paid vacation, paid sick leave, paid personal days, travel allowances, bereavement leave, pension benefits and "to the extent not set forth herein, [Plaintiff Moreau] shall be entitled to any employee benefits contained in the personnel policy of WHA that are not inconsistent with the above." App. B, § 4.

180.   By the terms of the Second Employment Contract, Moreau's employment could be terminated in a number of ways such as by mutual agreement; retirement or death of the employee, voluntarily by the employee with notice or for cause.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.
3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 17 of 45 PageID
#: 20

181.    The separation pay and benefits to which Plaintiff Moreau was entitled depended on the circumstances of separation.  App. B, § 6.

182.    The Second Employment Contract contained several provisions affording Moreau specific contractual due process rights prior to dismissal.  App. B, § 6.

183.    The Second Employment Contract contained improvements that favored Moreau, such as an increase in some benefits and a more generous renewal provision indicating that the Board desired to enter into a long-term relationship with Moreau.

184.    The Commissioners are responsible for reading and understanding materials presented to them and for voting accordingly.

185.    The Commissioners could have rejected the proposed agreement.

186.    The Commissioners voted to accept the new agreement with terms that were more favorable to Moreau.

187.    Accordingly, as of December 2019, the WHA was satisfied with Moreau's performance to the extent it voted to approve a new employment contract with him.

188.    As of December 2019, the WHA had not notified Moreau of any deficiencies with his performance or of any alleged misconduct.

189.    As of December 2019, no entity, such as HUD, the OIG, Marcum, and/or the Board's outside fee accountant, identified any issues with the WHA budget, payroll, employee raises, or Moreau's Employment Contract, that implicated job performance issues or potential misconduct on the part of Moreau.

190.    No one, including the Board members or its counsel suggested that there were any HUD regulations applicable to employment agreements with Executive Directors or that HUD needed to approve, in advance of executing the Second Employment Contract.

191.    No one suggested prior review or approval was necessary, because in fact, HUD regulations do not require such prior approval of employment agreements with Executive Directors.

*Plaintiff's Employment as Executive Director in 2020*

192.    In January 2020, the WHA hired a new Finance Director, Vasiliki Milios ("Milios").

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-CV-00411-MSM-LDA     Document 1-1     Filed 10/06/23     Page 18 of 45 PageID #: 21

193.    In March 2020, the COVID-19 pandemic necessitated that the WHA take emergency measures to protect the public health of its residents.

194.    The emergency measures included the necessity to hire a 24/7 security service to provide building security in the WHA housing facilities.

195.    The selection of the security firm was handled by Biron as Director of Security.

196.    Biron did not have significant procurement experience or training, and thus, Moreau told him to work with Castrataro, who was the WHA procurement expert.

197.    According to Biron's notes, he contacted about six different potential companies to solicit interest or information.

198.    In the end, as far as Moreau knew, proposals were received from two companies.

199.    One company (NES) proposed 24/7 security services for $44,800 per month based on a $25.00 per hour hourly rate per employee which was a lower bid than the other company that bid on the project.

200.    After receipt of the proposal, Biron wrote to Castrataro informing her that they wanted NES to start within a couple of days and "[c]ould you please look over this proposals and see if anything else will be needed from them * * *."

201.    Castrataro did not identify any issues with the selection process or proposal, but simply told him to get a certificate of insurance and told Biron that she would issue a blanket purchase order so that he did not have to issue numerous requisitions.

202.    Castrataro told Biron, "once the blanket order is placed you will only have to authorize the invoices."

203.    Castrataro and the staff in the Finance Department were all working on a hybrid basis at the time, and were involved in the procurement process as it related to the NES contract.

204.    The purchase order indicated that it would be increased as required but not to exceed $75,000.00.

205.    Moreau approved the purchase order.

206.    Before payment was to exceed $75,000, Castrataro had the authority to create and submit a new purchase order with a new threshold.

18

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 19 of 45 PageID #: 22

207.    In April 2020, the Board adopted a COVID response plan granting additional authority to Moreau to make decisions absent Board approval in order to ensure the health and safety of the WHA residents.

208.    At the same meeting, the Board voted to increase Moreau's authority to spend up to $50,000 without Board approval.

209.    The security firm NES continued working through the end of 2020.

210.    The cost of the services exceeded $75,000.

211.    Castrataro did not revise or create a new purchase order.

212.    Every month, NES submitted an invoice for the services and it was paid after review and approval by a number of people in the Finance and Procurement Departments.

213.    Every month, the check for payment was signed by Moreau and Milios and approved by the Board.

214.    The services provided by NES were essential to maintaining the health and safety of the residents of the WHA.

215.    The payments to NES and the services performed were open and notorious.

216.    By policy, Castrataro was supposed to review monthly all year-to-date vendor payments in order to identify any single vendor who has aggregate purchases at or approaching $3,000, the current competitive procurement threshold (which was lower than required, but set by Moreau).

217.    The policy did not require Castrataro to include information about the current threshold on any applicable purchase order.

218.    By policy, Castrataro was supposed to compare this list of vendors against the agency's contract register to identify frequently used vendors who may warrant individual contracts, or determine if they qualify under the State of RI Master Price Agreement ("MPA").

219.    By policy, Castrataro was supposed to publish the list to all employees who have the authority to make purchases, reminding them of their responsibilities to collect three pricing quotes for vendors appearing on this list.

220.    NES did not appear on any vendor commitment list prior to October 2020.

19

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 20 of 45 PageID #: 23

221.    In October 2020, NES first appeared on the list.  By that time, about $250,000 had been paid to NES for security services.

222.    Moreau had approved the payments in the normal course without consideration of any possible procurement issues.

223.    The payments were also approved by the Board.

224.    Moreau's failure to recognize the procurement issue was not intentional and caused no harm.

225.    Prior to the realization of the procurement issue, Moreau had not verbally been told that there was a problem that needed to be addressed by anyone in procurement or in finance.

226.    Even if Moreau had been directly notified that a policy violation occurred, no harm had resulted because the services still needed to remain in place.

227.    Moreau did not personally benefit from the fact that the NES was paid for its services in 2020.

228.    To date, there is no evidence that Moreau authorized payment to NES for any illegal, fraudulent or improper reason.

229.    NES was not overpaid for its services – the amount paid was the amount called for by the agreement and the company's employees performed the work associated with the payment received.

230.    Although the Board reviewed and approved invoices and payments, no one from the Board raised any issue with the fact that the WHA had paid the security service more than $250,000 without seeking bids from new companies or without issuing a new purchase order.

231.    This was the same kind of procurement issue the WHA faced in the past.

232.    In January 2021, Moreau told Biron to seek new quotes for the service.

233.    In the meantime, the WHA continued to pay NES for security services given the fact that the services were necessary to maintain health and safety of the residents.

234.    The budget for FY 2020 was not completed and submitted to the Board until October 2020.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 21 of 45 PageID
#: 24

235. Accordingly, just like the year before, the Board operated for a significant part of the year without a budget.

236. Again, this meant that all WHA expenses from January through October 2020 were not part of any approved budget, including the salaries paid to all employees.

237. In the meantime, in December 2020, Marcum began collecting information from the WHA to conduct its 2020 audit.

238. Specifically, Marcum requested information about a number of contracts, purchase orders and invoices.

239. Upon information and belief, Marcum did not initiate a request for any information about the NES contract.

240. In January 2021, Biron again solicited quotes from companies to perform security services at WHA.

241. Biron told Castrataro that NES submitted a proposal but that six other companies were slow in responding.

242. NES was ultimately selected to do the work.

243. Castrataro did not draft any purchase order this time.

244. As of April 2021, the WHA paid NES another $162,000 for 2021, again for necessary services which were open and notorious to all involved.

245. The annual audit for FY 2019 was completed by Marcum in February 2021, with the delay being attributed to COVID-19.

246. Marcum's audit for FY 2019 resulted in one finding. In particular, Marcum found another procurement issue. Again, this issue had to do with exceeding the threshold payment limit without soliciting new quotes.

247. Marcum transmitted its findings to HUD, as in the normal course.

248. Marcum did not identify any other issues, such as issues with the Second Employment Contract (which had been in place since January 2019), the pay raises afforded to Biron, Lapierre and Maynard (all of which existed in 2019) or any other issue.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA     Document 1-1     Filed 10/06/23     Page 22 of 45 PageID #: 25

*The Mayor appoints New Board Members*

249.    As of March 2021, the Board had not brought any performance issues to Moreau's attention.

250.    As of March 2021, the Board had not brought any issues of alleged misconduct to Moreau's attention.

251.    Moreau had a positive working relationship with all the Board members and its counsel.

252.    The financial position of the WHA was strong.

253.    As of March 2021, neither Marcum, the OIG, HUD, or the outside fee accountant brought any issues to the attention of Moreau regarding his job performance or any issues of alleged misconduct.

254.    On April 13, 2021, HUD wrote to the WHA informing the agency that the WHA did not have to repay more than $3.5 million in federal funds originally recommended by the OIG report.

255.    This was a major accomplishment by Moreau and the staff who worked on the Corrective Action Plan.

256.     HUD's decision as to procurement issues was based on its determination that it now had the documentation to support the conclusion that all costs were reasonable and necessary.

257.    HUD's decision as to procurement issues was based on the fact that the WHA had strengthened its policies and procedures and that the WHA had trained employees on the relevant matters.

258.    In closing, HUD thanked the WHA for the "tremendous amount of work put into correcting the deficiencies outlined in the audit report."

259.    As part of the process, WHA employees had undergone, collectively, about 500 hours of training.

260.    The WHA's annual meeting was scheduled for April 15.

261.    One of the agenda items was the annual discussion of Plaintiff's job performance and status of his "current employment agreement and its renewal."

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 23 of 45 PageID
#: 26

262.    Upon information and belief, on April 14, 2021, then-Commissioners Clancy, Cayer, and Dubois were contacted by the Mayor and told that their services were no longer needed and that they should not attend the April 15 meeting.

263.    In their place, the Mayor appointed three new Commissioners who appeared on April 15, Michael Houle ("Houle"), Lucienne Cote ("Cote") and Scott MacLennan ("MacLennan").

264.    Houle was the former Chief of the Police Department.

265.    Houle retired from the Police Department years earlier amidst public controversy.

266.    As publicly reported, in March 2008 Houle said in a letter that "he can no longer run the police department because unnamed people are interfering with its day-to-day operations."

267.    As publicly reported, the Police Union made allegations of test fixing which led to then-Mayor Menard ordering an internal affairs investigation into the allegations.

268.    According to public reports at the time, "the allegations center on Houle and his second in command. Houle's ex-wife, Martha Bish, claims that he helped her get on the force when they were still together. Last spring, Houle was suspended for improperly destroying drug evidence. Around the same time, an officer was charged with computer tampering. Five Woonsocket officers were disciplined in November after a woman arrested for a drug offense managed to sneak a handgun into a jail cell. In January, an arrested man hanged himself inside police headquarters."

269.    Upon information and belief, Moreau, who was a Police Union official at the time was one of the "unnamed people" that Houle believed was interfering with the operation of the department and otherwise involved in providing information that led to the exposure of Bish's claims.

270.    Moreau actions and complaints were in opposition to activity which he reasonably believed was illegal.

271.    Moreau knew that his employment may be in jeopardy because, upon information and belief, not only had the Mayor wanted the prior Commissioners not to hire him as Executive Director, but she was also replacing the Commissioners who did not follow her directive with at least one person who had a motive to retaliate against him.

272.    The Mayor wanted Moreau replaced because, among other things, Moreau refused to and opposed violating HUD regulations.

273.    Houle confirmed Moreau's suspicions when, during the very first conversation Houle had with Moreau in his new role, Houle brought up the history between them from the Police Department.

274.    Houle started the conversation by saying to Moreau: "you and Roger fucked me."

275.    The Roger Houle referred to was Roger Biron.

276.    The reference to Moreau and Biron "fuck[ing]" Houle referred to the fact that Moreau and Biron's actions exposed Houle's earlier inappropriate and/or illegal conduct which resulted in the loss of his job as Police Chief.

277.    Houle then said something facetious to Moreau like: "not to worry" because "there isn't going to be a vendetta," while at the same time saying something like "but I do not forget."

278.    Houle did then engage in hostile acts with respect to Moreau.

279.    For example, Houle immediately began his own investigation into Moreau in an attempt to find a pretextual reason for dismissal.

280.    Prior to the initiation of the investigation, Houle had no complaint from any person about any possible misconduct on the part of Moreau.

281.    Upon information and belief, Houle had no firsthand knowledge of any possible misconduct on the part of Moreau prior to initiating his investigation.

282.    Upon information and belief some or all of Houle's investigative efforts were taken without prior Board knowledge or authorization which continued over the next ten (10) months.

283.    Very soon after Houle's comments were made, Moreau contacted Maura O'Brien at the Boston HUD office and reported the threat that Houle made.

284.    Moreau's report to O'Brien was an exercise of protected activity.

285.    At the April 15 meeting, Chairman Levesque was re-elected Chairman and Cote was voted in as Vice-Chairperson.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 25 of 45 PageID #: 28

286.    One of the agenda items was to approve payment of the monthly bills.

287.    The monthly payment of the bills, which included the NES invoice, was approved by five Commissioners, including Houle.

288.    Following the meeting, the Board, including its new members, did not communicate to Moreau any issues with his job performance or otherwise.

289.    On April 19, Chairman Levesque resigned.

290.    Levesque told Moreau he chose to resign because he did not want to be part of the new direction of the Board, and specifically the direction Houle was going in.

291.    Immediately after his appointment, Houle began questioning the formation and terms of Moreau's employment, including requesting a copy of his Second Employment Contract and asking questions about who drafted the document.

292.    Once Houle had a copy of the 2019 Employment Agreement, he began asking for contracts that pre-dated the 2019 Agreement.

293.    In response, the Attorney for the Board informed Houle that the contract he had was the one in effect as of April 2021 and it was approved by the Board.

294.    In addition to questioning Moreau's employment agreement, Houle also began his own investigation into the NES contract.

295.    In late April 2021, Houle wrote to Moreau asking for documentation related to the NES contract.  After he received the contract, Houle wanted copies of the bids.

296.    It appeared Houle was trying to find an issue with how NES was selected and paid.

297.    Because of the easing of COVID-19 restrictions, NES had already been told its services were no longer needed beyond May 7, 2021.

298.    Houle ignored the fact that the Board approved payments to NES, and that NES did the work it was paid for and that the services were no longer needed or almost at the point where they were no longer needed.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 26 of 45 PageID
#: 29

299.    Instead, upon information and belief, Houle remained focused on finding something he could blame on Moreau in order to jeopardize his employment even if those items were already subject to Board approval and occurred before his tenure.

300.    On April 28, 2021, another Board member, Paul Lozeau ("Lozeau") resigned.

301.    Initially, when the Mayor replaced three members and Levesque resigned, Lozeau said he intended to stay.

302.    On May 13, 2021, HUD wrote to WHA with its review of Marcum's 2019 annual audit.

303.    With respect to the Marcum finding regarding the procurement issue, HUD noted that the issue had essentially been the same or similar as the 2018 issue, that it was addressed by HUD in an October 2019 letter, and that given the April 2021 decision of HUD on the OIG audit, it was recommended that the WHA should: (a) periodically review expenditures for frequently recurring transactions with vendors that could exceed the competitively procurement thresholds; and (b) periodically compare the contract register against frequently used vendors.

304.    The HUD letter noted that the WHA's response to Marcum's 2019 finding referred back to the procurement changes made in 2018, and that the functions listed in (a) and (b) were already part of the process to be completed by the Procurement Officer by its policies.

305.    In addition, the WHA informed HUD that in FY 2020, it conducted a competitive bidding process for the services identified in the 2018 and 2019 audits as being non-competitively procured, noting that the contract in each case went to the lowest responsive and responsible bidder.

306.    HUD noted that it was "confident" that the Corrective Action Plan provided addresses the issues in the FY 2018 and 2019 audits completed by Marcum.

307.    As it has done in the past, HUD requested written confirmation in response, which Moreau did.

308.    The next Board meeting was scheduled for May 20.

309.    Prior to the May 20, 2021 Board meeting, Houle again asked for the issue of Moreau's employment agreement to be placed on the agenda.

310.    Also on the May 2021 agenda, were items related to the "2019 Salary Increases for the following positions: Human Resources Director, Assistant Director/Director of Security,"

and "Discussion Regarding Contract Register [] NES Solutions Vendor Procurement," as well as separate legal counsel for the Board.

311.    At the May 20 meeting, Houle was elected to serve as Chairman of the Board.

312.    Milios gave a brief presentation on the 2019 audit noting that Marcum focused on the financial statements, internal controls on financial reporting and compliance with federal requirements.

313.    Milios noted that there was one instance in which a purchase did not follow a policy in a purchase that exceeded $50,000 and that a corrective action statement was submitted and accepted by HUD to correct the deficiency.

314.    The Board approved and accepted the completed audit for FY 2019.

315.    When the issue of Moreau's contract came up, the Board voted to table the matter.

316.    When the issue of the 2019 salaries came up, the Board voted to table the matter, even though it had just approved the 2019 audit.

317.    The Board then discussed the NES contract.

318.    Castrataro gave the Board a copy of the contract register that showed the type of contract, the vendor, the contract amount and the status.

319.    The information the Board already had, of which it was fully aware, that the payments to NES exceeded the purchase order, was revisited.

320.    Moreau explained the emergency nature of the need for the security services.

321.    D'Agostino recognized the difficulty the pandemic caused, and asked if the WHA could get an opinion from HUD on how to handle the NES purchase order.

322.    Nothing was revealed at the May 20 meeting indicating that any errors that had taken place with respect to NES were any different than the same type of issues identified in the 2017, 2018 and 2019 audits or that any mistakes that were made intentional or willful.

323.    The issue was one of form and record keeping, not substance.

324.    After the May 20 meeting, Commissioner Lucienne Cote (who had just been appointed in April) resigned.   She was later re-appointed.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-cv-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 28 of 45 PageID #: 31

325.    Pursuant to the discussion at the Board meeting, on May 27, 2021, Moreau wrote to the Director of HUD, Robert Cwierka, requesting retroactive relief regarding the NES contract.

326.    Moreau was notifying HUD of the same type of procurement issue identified in the 2017, 2018 and 2019 audits.

327.    Moreau transmitted the letter based on the facts as he understood them, and did not intentionally or otherwise misrepresent any facts to HUD.

328.    Upon information and belief, despite the fact that Moreau had already written to HUD asking for retroactive relief regarding the procurement procedures for the NES contract, sometime between May 2021 and October 2021, Houle contacted the outside auditor, Marcum, and requested that they investigate three issues for potential wrongdoing by Moreau, the NES contract, the 2019 pay raises and Moreau's Second Employment Contract.

329.    Upon information and belief, Houle engaged in these actions, even though Marcum had already completed the audit for 2019, which was approved by the Board.

330.    Upon information and belief Houle engaged in these actions, even though Marcum, as part of its FY 2020 audit, did not initiate a request for these records and was otherwise not planning on reviewing these issues absent Houle's suggestion that they be examined.

331.    Upon information and belief Houle engaged in these actions, even though Marcum typically directs what issues or documents it will review in connection with its annual audit.

332.    Accordingly, unbeknownst to Moreau, Houle was essentially the complaining witness against him.

333.    On October 13, 2021, Marcum transmitted a letter to the Board that purported to serve as the audit for the year ending December 31, 2020.

334.    Significantly, the Marcum letter did not indicate *who* brought the pre-2020 issues to its attention or *when* it first became aware of such issues.

335.    The issues examined by Marcum in the 2020 audit ultimately focused on the actions of three employees, Moreau, Biron (who also worked with Houle at the Police Department and who was also a Police Union Official prior to Houle's retirement) and Lapierre.

28

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 29 of 45 PageID #: 32

336.    For example, on page 1 of its letter, Marcum states that "[a]s a result of our audit procedures, Marcum identified the following *instances of non-compliance* with applicable laws, regulations and contracts and grant agreements." (emphasis added).

337.    Marcum stated that one of the instances of non-compliance was "[n]on-competitive procurement of security services *resulting in material misuse of federal funds and possible procurement fraud (bid-rigging)*.

338.    The report by Marcum does not contain any facts to support the statement that there was any material misuse of federal funds by Moreau or the WHA (i.e., that HUD prohibited use of federal funds for security services or that federal funds for security purposes were used for non-security purposes).

339.    The report by Marcum does not contain any facts to support the statement that there was any "potential procurement fraud (bid-rigging)" by Moreau or anyone at the WHA.

340.    In the audit, there was no evidence of "fraud" or "bid rigging" whatsoever, both of which would have involved some intent to avoid procurement procedures for personal gain.

341.    In its report, Marcum stated that Moreau told HUD that the finance department did not communicate when the procurement threshold was being approached or exceeded.

342.    Marcum noted that this should have been the responsibility of the Procurement Officer, not the Finance Department and that the Finance Department was properly tracking NES expenditures.

343.    Marcum noted that the Vendor Commitment report did not include the NES payment until October 2020, but that the appropriate procurement action was not taken in response to that report.

344.    Another issue raised in the Marcum report related to the 2019 pay raises, not only to Biron, Maynard and Lapierre, but the report included a reference to Lanoue, who had been re-hired on a part-time basis as a non-union employee.

345.    Significantly, Marcum included these issues in the 2020 audit, even though they occurred in 2019, an audit year already completed and approved by the Board.

346.    Marcum stated that it was "possible" that the pay raises were unauthorized.

347.    Marcum also questioned the 2019 Employment Agreement, characterizing it as a "possible abuse of trust" of the Board based on the allegation that Moreau "put[] forth a contract for approval that lacked the requisite transparency and disclosure for the substantial

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

1:23-CV-00411-MSM-LDA     Document 1-1     Filed 10/06/23     Page 30 of 45 PageID #: 33

modifications that it contained, including the length of the contract which exceeded the time period allowed by HUD."

348.    Upon information and belief, Marcum reached its conclusions absent any input from Moreau, Biron or Lapierre.

349.    Upon information and belief, Marcum did not interview anyone from HUD or NES prior to reaching any of its conclusions.

350.    Upon information and belief, although all of the issues Marcum identified would have involved the Board members in place at the time of the events, it appears that Marcum did not interview any Board members who were officials at the time of relevant decision-making or its legal counsel except for one statement by D'Agostino, who was also employed by the City.

351.    Marcum did not reveal in its audit whether any of its information came from Houle.

352.    Upon information and belief, between April and October 2021, as part of his own investigation, Houle consulted with outside legal counsel to act as an investigator ("investigator") without first seeking Board approval or complying with WHA procurement policy or procedure applicable to hiring professionals.

353.    Upon information and belief, Houle transmitted the Marcum letter to the investigator, who, upon information and belief, had not yet been retained by the Board.

354.    Upon information and belief, Houle wanted the investigator to conduct another investigation predicated on the Marcum report as if Marcum initiated the complaint.

355.    The Board met on October 21.

356.    The normal procedure would have been for the Marcum report to be transmitted to HUD, and, as in years past, for HUD to determine next steps to address the deficiencies identified in Marcum's audit.

357.    The procedure would have been for HUD to communicate with Moreau, and for a corrective action plan to be submitted, if necessary.

358.    For example, if HUD determined that by its regulations, the term of the 2019 Employment Agreement conflicted with its regulations or guidance, the parties could have corrected any issues per HUD's guidance.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 31 of 45 PageID #: 34

359.     For example, the WHA and Moreau could have drafted and executed a new employment agreement, because again, up until this point Moreau had no performance issues.

360.     For example, if HUD informed the WHA that it would not afford retroactive relief for the NES contract issues, a corrective action plan could have been submitted.

361.     The typical procedure was not followed.

362.     Instead, Houle made a motion to move into executive session to discuss "investigation proceedings regarding, allegations of misconduct * * * and the retention of special counsel of law, * * * to assist in the same." (hereinafter the "law firm.").

363.     The investigator with whom Houle already consulted was employed by the law firm.

364.     The law firm previously represented the City and the Mayor in other matters.

365.     The Board voted to suspend Moreau with pay pending an investigation.

366.     The letter notifying Moreau of his suspension indicates that the law firm would be investigating the matters contained in the Marcum report.

367.     Moreau had yet to see the Marcum report.

368.     The Board appointed Milios as Interim Executive Director and Interim Human Resources Director, such that she would now be responsible for three separate functions.

369.     In December 2021, the Board's incumbent attorney was terminated.

370.     The Board members learned of the attorney's dismissal at the December 16, 2021 meeting.

371.     At the December 16, 2021 WHA meeting, Houle addressed the Acting Executive Director and the Board to discuss "roles, responsibilities, authority as it relates to procurement, authority, expectations and requirements of the Acting Executive Director during the current investigation."

372.     Significantly, at no time between April 2021 and the time Moreau was placed on leave, did Houle discuss any of his expectations for Moreau as it related to procurement.

373.     At the December 28, 2021 meeting the Board hired the law firm to replace the dismissed legal counsel even though it also employed the investigator.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 32 of 45 PageID #: 35

374.    Accordingly, as the investigation proceeded, the lawyer employed by the Board to give it advice and the investigator hired to conduct the investigation were employed at the same law firm.

*Moreau's Dismissal*

375.    The investigator conducted interviews in connection with its investigation and gathered documents.

376.    Moreau was interviewed on February 4, 2022.

377.    Houle was present for the interview and took handwritten notes.

378.    Although Houle initiated the investigation into Moreau, upon information and belief, he was not interviewed and did not give a written statement.

379.    No one from Marcum was interviewed and their investigative file was not made part of the investigator's report.

380.    Before the investigation was completed, on February 18, 2022, Houle issued a press release releasing to the public Marcum's 2020 audit.

381.    Upon information and belief, Houle did so without first informing the members of the Board or obtaining Board authorization.

382.    Houle included reference to the October 2021 letter from Marcum which purported to be the results of the 2020 audit.

383.    Houle's press release included a copy of a February 10 letter to the Board from Marcum with an attached 2020 audit which was the type of audit traditionally performed and unlike the communication from October 2021.

384.    Both audits from Marcum were allegedly premised on an engagement letter from April 2021 and a planning meeting in May 2021.

385.    The February 2022 Marcum audit for FY 2020 identified the deficiencies originally noted in the October 2021 calling each item a "deviation from the Authority's internal control processes and procedures."

386.    The February 2022 Marcum audit for FY 2020 contained recommendations to address the deviations.

387.    For example, Marcum recommended that the WHA take appropriate action to discourage overrides of internal controls and eliminate opportunities to bypass controls where possible.

388.    With respect to the deviation regarding NES, in that the contract exceeded the $75,000 threshold in the purchase order, Marcum noted that this was a repeat finding from the prior year.

389.    Marcum recommended that the Board adopt a new policy requiring the WHA to prepare a timely budget for Board approval prior to the start of the fiscal year, acknowledging that prior to February 2022, no such policy existed.

390.    Marcum recommended installation of the computer Procurement Module, the same type of program purchased by Moreau and advised the Board to hire an additional qualified person to work in Procurement to assure proper and timely processing of contracts, acknowledging that at least part of the reason for the procurement failures was due to understaffing in the procurement department.

391.    Marcum recommended that raises for employees should follow the collective bargaining agreements or for non-union employees, the annual budget.  Further, Marcum recommended the Board review the policy for implementation of salary increases to ensure the approval process is followed prior to implementation.

392.    Marcum recommended that the Board issue a new policy pertaining to Employment Contracts with Executive Directors which allows for a two-year employment contract with up to three one-year extensions (for a total of five years per agreement), acknowledging that up to this point, the Board had no policy regarding Employment Contracts.

393.    Marcum did not recommend termination of employment of any WHA employee.

394.    Marcum's recommendations were transmitted to HUD.

395.    Prior to Houle's release of the second 2020 audit, it had not been the subject of any WHA Board meeting.

396.    On March 1, 2022, HUD wrote to Milios, Acting Executive Director, regarding the findings of the February 2022 audit by Marcum.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-CV-00411-MSM-LDA     Document 1-1     Filed 10/06/23     Page 34 of 45 PageID #: 37

397.    As in past years, HUD noted that a procurement finding from 2019 was carried forward into 2020.

398.    As in past years, the procurement issue was addressed by corrective action, and not by discipline of any employees.

399.    Upon information and belief, HUD did not recommend the termination of any WHA employee.

400.    On March 17, 2022, the investigator issued its report to the Board.

401.    The investigator concluded that Moreau "repeatedly violated HUD polices and WHA rules, regulations, contracts and budgets.  As a result, the WHA has already *lost hundreds of thousands of dollars in unauthorized expenditures*, and its remains at risk of losing more than $1.0 million more depending on the outcome of potential litigation about Executive Director Moreau's nine-year severance claim."

402.    The investigation did not include interviews with all prior Board members who constituted the official decision-makers of the agency at the time the 2019 pay raises occurred or in 2019 when the Second Employment Contract was executed or in 2020 when the NES contract originated.

403.    The report was premised on alleged violations of HUD policy or procedure, yet the report contained not a single citation to such regulation or policy or any interview of any HUD official.

404.    As of the time the report was issued, the WHA had not yet received a response to Moreau's letter requesting retroactive relief.

405.    On March 21, Moreau was notified that the Board was considering issuing discipline to him, up to and including termination of employment, based on a number of accusations all stemming from Houle's original investigation which had now been ratified by the investigator.

406.    The Board informed Moreau that prior to taking disciplinary action, it would give him an opportunity to be heard.

407.    The Board made this decision at its March 21 meeting.

408.    The Board gave Moreau, through counsel, about three hours' notice of its intention to discuss his job performance at its March 21 meeting.

34

409.    On March 28, the Board notified Moreau that it would give him an opportunity to be heard on April 7.

410.    In its March 28 letter, the Board noted Moreau had violated at least five different policies as well as state and federal laws and regulations.

411.    Following issuance of the letter, Moreau requested, through counsel, copies of any and all policies which WHA contended were violated.

412.    After receipt of a number of documents, Moreau, through counsel, sent a letter dated April 4, pointing out that pursuant to the Second Employment Contract, before the Board could consider discipline of Moreau, there were particular contractual procedures which must be followed.

413.    In that section, the Employment *prior to discharge*, the Board agreed that the: "Employee shall have thirty (30) days or such longer time as the Board deems appropriate in its sole discretion to correct his deficiencies." (emphasis added).

414.    The Board agreed that if the employee fails to correct the deficiencies within (30) days of being notified of the deficiencies, "the Board shall *adopt a resolution* by affirmative [vote] at a meeting of the Board called for such purpose (after reasonable notice to Employee and an opportunity for Employee to be heard before the Board at the meeting called for such purpose), finding by vote of the majority of the members present, that in the good faith opinion of the Board, Employee's conduct constitutes "[c]ause" *and specifying the particulars thereof*." (emphasis added).

415.    The agreement further provides that "[t]he WHA may terminate Employee's *employment* hereunder at any time *upon sixty (60) days' notice written notice*, with cause, provided, however, that Employee's contract and any extension or renewal thereof, is terminable for 'good cause' (just cause), *after providing the Executive Director with three (3) months written notice, a fair opportunity to be heard * * * This contract of the Executive Director shall be terminated only upon a full and unanimous roll call vote of the Board of Commissioners." (emphasis added).

416.    The December 2019 contract also had a dispute resolution provision, requiring the parties mediate any dispute as "to the interpretation or application of this Agreement, other than a "For Cause" termination pursuant to Paragraph 6(e) herein * * *."

417.    The December 2019 contract also provided that "[t]he invalidity of all or any part of any section or paragraph of this Agreement shall not render invalid the remainder of this Agreement or the remainder of such section or paragraph. If any provision of this Agreement is

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 36 of 45 PageID #: 39

so broad as to be unenforceable, it is expressly intended by the parties hereto that such provision shall be interpreted to be only as broad as is enforceable."

418.    Accordingly, the suggested notice and opportunity to be heard was not in compliance with the contract.

419.    By agreement, an opportunity to be heard could not take place until the Board first complied with the procedures in the contract.

420.    In addition, counsel pointed out that none of the policies cited by the Board were actually violated by Moreau and/or some were completely inapplicable.

421.    On April 7, the Board proceeded to meet to discuss the potential discipline of Moreau.

422.    Moreau was permitted to make a statement in response to the allegations in the Report.

423.    This opportunity was provided *before* the Board identified any specific charges against Moreau.

424.    Only after Moreau and counsel spoke did Board counsel advise the Board that it could terminate the *agreement* (separate from Moreau's employment) *for cause*, which would then allow the Board to treat Moreau as an at-will employee and avoid having to comply with any of the contract's provisions such as notice and an opportunity to correct his actions or the requirement that the vote be unanimous.

425.    Board counsel then asked the Board to consider the first issue – whether Moreau engaged in misconduct to determine if the contract should be terminated for cause.

426.    Board counsel argued the facts that supported a finding of misconduct.

427.    Moreau was not given an opportunity to respond to the argument (either factually or legally) that was presented by Board counsel at the meeting regarding termination of the agreement as a separate concept from termination of employment.

428.    For example, after Board counsel's lengthy argument about misconduct in connection with the Board's consideration of termination of the contract, Moreau was not given an opportunity to respond to the lengthy legal argument made by Board counsel.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 37 of 45 PageID #: 40

429.    As part of Board discussion, Houle stated he had been involved in "it" for a year, which would refer back to the point he was initially appointed, confirming the fact that his investigation began from the very first point he became a Board member.

430.    As part of the discussion, one Board member, D'Agostino asked Board counsel if he was asserting that he had direct evidence that Moreau lied about what information he had about NES exceeding the threshold before he wrote to HUD asking for retroactive relief.

431.    Specifically, the issue was whether Moreau made a "material misrepresentation" to HUD sufficient to justify terminating the contract (again, not his employment).

432.    Board counsel told D'Agostino that it was up to the Board to determine if Moreau lied and that the standard to be applied was proof of the material misrepresentation beyond a reasonable doubt.

433.    The investigator then spoke in support of his conclusion that his review of documents constituted communication from the Finance Department to Moreau of the overage on the NES contract.

434.    The discussion was focused on whether the Finance Department did or did not inform Moreau of the fact that the NES contract exceeded the threshold in order to determine if a material misrepresentation was made to HUD.

435.    No one, including either Board counsel or investigator, described for the Board the elements or definition of the term material misrepresentation.

436.    Following this logic, the Board voted to terminate the agreement (not Moreau's employment) for cause based on a finding that Moreau made a material misrepresentation.

437.    The Board proceeded to vote on additional, separate reasons to terminate the contract including that Moreau knowingly exceeded the $75,000 threshold on the purchase order when he approved NES invoices for payment beyond $75,000 and that he violated personnel policy regarding the 2019 raises.

438.    As part of this discussion, Houle discussed allegations and matters outside of the report.

439.    The strategy of terminating the contract first purported to allow the Board to now consider Moreau an at-will employee.

440.    Based on four separate votes finding four reasons for terminating the contract, the Board then considered whether to terminate Moreau's employment.

37

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 38 of 45 PageID #: 41

441.    In taking this vote, the Board considered Moreau an at-will employee.

442.    Prior to considering termination from his employment as an at-will employee, the Board did not give Moreau notice and an opportunity to be heard on the specific reasons it would be considering termination as an at-will employee, the four causes that had just been identified only moments before.

443.    The Board did not act on the allegation that Moreau engaged in any wrongdoing with respect to the Second Employment Contract and thus, did not invalidate it on the basis that it violated HUD policy or any other law or regulation.

444.    The Board did not permit counsel for Moreau to speak during this portion of the meeting, noting that it would violate the Open Meetings Act as no public comment was listed on the agenda.

445.    The Board voted to terminate Moreau as an at-will employee.

446.    The Board never issued a letter of termination to Moreau setting forth the reasons for termination.

447.    After Moreau's termination, the Board also terminated Lapierre and Biron.

448.    At the time of termination, there were at least two Board members employed by the City.

449.    The City and WHA are supposed to be separate entities.

450.    There is no City policy that prohibits an employee who is separated from employment with the WHA to be disqualified from City employment.

451.    As retired police officers, both Moreau and Biron were eligible to work police details with the City Police Department.

452.    Following discharge, both Moreau and Biron were told they were no longer eligible to work for the City.

453.    Upon information and belief, Calouro, who was employed by the Police Department and was also a Commissioner was involved in the decision to disqualify Moreau and Biron from working details for the City.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA     Document 1-1     Filed 10/06/23     Page 39 of 45 PageID
#: 42

454.     Prior to eliminating the right to work details, Moreau was not given any notice or opportunity to be heard by the City or any City official responsible for the decision to disqualify him from working details.

455.     Biron grieved his dismissal, and reached an agreement with the WHA which included an agreement that the Police Department would reinstate his privileges to work details for the Police Department.

456.     The Board reached this agreement, even though it has no authority over the decision-making of the Police Department.

457.     Calouro remains a member of the administration of the Police Department and a member of the WHA Board.

458.     After Moreau was dismissed, the Director of Security left the employment of the WHA.

459.     The WHA sought to hire a Director of Security.

460.     The hiring decision was up to Milios.

461.     Houle wanted Milios to hire another former police officer to fill the position.

462.     The Board was also in the process of hiring a permanent Executive Director.

463.     Milios, who had been performing the job on an acting basis, applied for the job.

464.     The Board did not hire Milios and she ultimately resigned.

465.     The Board then hired the former police officer who Houle wanted to hire as Director of Security as the Executive Director of the WHA.

466.     Upon information and belief, the new Executive Director has zero experience working at a housing authority but is friends with Houle.

467.     After the investigation was concluded and the WHA went out to bid for permanent legal counsel on labor matters, it selected the same law firm that employed "temporary" legal counsel and the investigator.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.
3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 40 of 45 PageID #: 43

**COUNT I –**
**Violation of Civil Rights**
**42 U.S.C. § 1983**
**Fourteenth Amendment – Due Process**
**(All Defendants)**

468.    Plaintiff hereby incorporates all paragraphs above as if set forth herein.

469.    Defendants, acting under color of state law, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, have violated Moreau's due process rights by causing him to suffer harm as aforesaid, and have thereby deprived Moreau of his rights secured by the Fourteenth Amendment of the United States Constitution, actionable pursuant to 42. U.S.C. § 1983.

470.    At all times, Defendants acted intentionally with respect to Moreau's clearly established constitutionally protected rights to both procedural and substantive due process.

471.    Defendants' violation of Moreau's constitutional rights has caused him harm in an amount to be proven at trial.

**COUNT II -**
**Breach of Contract**
**(Defendant WHA)**

472.    Plaintiff hereby incorporates all paragraphs above as if set forth herein.

473.    By the aforesaid actions, the WHA breached its contract with Moreau.

474.    Among other things, the WHA did not have sufficient cause to terminate Moreau's employment.

475.    Among other things, the WHA did not have sufficient cause to terminate the employment agreement.

476.    Among other things, the WHA had no legal or other authority to disregard the procedural protections set forth in the contract or to treat Moreau as an at-will employee.

477.    The WHA's breach of Moreau's contract has caused him harm in an amount to be proven at trial.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 41 of 45 PageID #: 44

**COUNT III -**
**Rhode Island Whistleblowers' Protection Act**
**G.L. 1956 § 28-50-1 et seq.**
**(Defendant WHA)**

478.    Plaintiff hereby incorporates all paragraphs above as if set forth herein.

479.    Moreau engaged in multiple instances of protected activity.

480.    Defendants violated the Rhode Island Whistleblowers' Protection Act with respect to Moreau by subjecting him to adverse employment action in retaliation for his protected activities.

481.    The WHA's acts of retaliation have caused Moreau harm in an amount to be proven at trial.

**COUNT IV –**
**Uniform Declaratory Judgments Act**
**G.L. 1956 § 9-30-1 et seq.**

482.    Plaintiff hereby incorporates by all paragraphs above as if set forth herein.

483.    By state law, city officials may not be appointed Commissioners. G.L. 1956 § 45-25-10(a) ("No commissioner shall be a city or state official; provided, that members of the housing authority of the City of Providence may serve on the city council.").

484.    The City, acting through its Mayor, Lisa Baldelli-Hunt, appointed both D'Agostino and Calouro to the Board.

485.    Plaintiff requests a declaration that neither D'Agostino, nor Calouro, as city officials, were supposed to serve as Commissioners of the WHA.

486.    Plaintiff requests a declaration that the appointments of both D'Agostino and Calouro are void ab initio.

487.    The City, through its Mayor, Lisa Baldelli-Hunt, appointed Houle to the Board. At the time, Houle was not employed by the City.

41

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 42 of 45 PageID #: 45

488.    Since appointing Houle to the Board, and since Houle initiated the investigation concerning Moreau and was successful in his effort to dismiss Moreau, the Mayor has hired Houle as Director of Human Services, a city employment position.

489.    Houle cannot serve in both capacities without violating § 45-25-10(a).

490.    In the context of its investigation and termination decision, the WHA Defendants concluded that Moreau had engaged in a material misrepresentation with respect to a letter he wrote to HUD.

491.    Among other things, to find a material misrepresentation, the WHA had to establish that something Moreau said was knowingly false.

492.    Among other things, to find a material misrepresentation, the WHA had to establish that Moreau's statement to HUD induced HUD to take some action or refrain from taking some action based upon the alleged misrepresentation.

493.    Prior to concluding that Moreau had engaged in material misrepresentation, the WHA had not established anything that Moreau said was false and/or knowingly false.

494.    In particular, neither the WHA, nor the investigator, conducted any interview with the employees in the procurement or finance department to assess what communications they had with Moreau before the letter to HUD.

495.    Prior to concluding that Moreau had engaged in material misrepresentation, the WHA had no information from HUD concerning any actions or inactions taken based upon Moreau's letter requesting retroactive relief.

496.    To date, HUD has not acted on the request for retroactive relief and has not alleged that Moreau made any material misrepresentation.

497.    Moreau respectfully requests a declaratory judgment that he did not engage in any material misrepresentation as determined by the WHA.

498.    Moreau respectfully requests a declaration that the WHA impermissibly premised its actions upon findings or allegations that were never ratified by HUD and not supported by any credible evidence "beyond a reasonable doubt" or otherwise.

## COUNT V –
## Intentional Interference with Contractual Relations
## (All Defendants)

522.    Plaintiff hereby incorporates all paragraphs as if set forth herein.

523.    Plaintiff had an employment contract with WHA.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 43 of 45 PageID #: 46

524.    Defendant Houle, in both his individual and official capacity, knowingly induced the Board to violate and/or interfere with the contract.

525.    Defendant Houle, in both his individual and official capacity, knowingly violated and/or interfered with the contract.

526.    Defendant Houle acted intentionally and without legal justification.

527.    Moreau has been harmed by Defendant Houle's actions in an amount to be proven at trial.

528.    Moreau had a contractual right, based on his former employment with the City, to work police details in retirement.

529.    Defendant Calouro knowingly violated and/or interfered with the contract acting in both his official and individual capacities.

530.    Defendant Calouro acted intentionally and without legal justification.

531.    Moreau has been harmed by Defendant Calouro's actions in an amount to be proven at trial.

532.    Defendant City, acting through its Mayor, knowingly induced the Board to violate and/or interfere with the contract with Moreau.

533.    Defendant City, acting through its Mayor, acted intentionally and without legal justification.

534.    Moreau has been harmed by the Mayor's actions in an amount to be proven at trial.

## COUNT V–
## Intentional Interference with an Advantageous Business Relationship
## (All Defendants)

535.    Plaintiff hereby incorporates all paragraphs as if set forth herein.

536.    Moreau had a business relationship with WHA.

43

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

3-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 44 of 45 PageID
#: 47

537.    Defendant Houle interfered with this relationship through an improper motive or means and while acting in both his official and individual capacities.

538.    Plaintiff has been harmed by Defendant Houle's actions in an amount to be proven at trial.

539.    Defendant City, through its Mayor, interfered with the relationship between Moreau and the WHA through an improper motive or means.

540.    Plaintiff has been harmed by Defendant City's actions in an amount to be proven at trial.

541.    Plaintiff had a business relationship with the Police Department and/or a prospective relationship concerning paid retiree details.

542.    Defendant Calouro, in both his official and individual capacities intentionally interfered with the relationship between Moreau and the Police Department through an improper motive or means.

543.    Plaintiff has been harmed by Defendant Calouro's actions in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

Plaintiff prays that this Court:

(1) declare that the Defendants actions complained of are unlawful;
(2) order the Defendants to make the Plaintiff whole;
(3) order that the Defendants pay Plaintiff compensatory damages;
(4) order that the Defendants pay Plaintiff punitive damages;
(5) order that the Defendants pay Plaintiff liquidated damages;
(6) retain the jurisdiction of this action to ensure full compliance;
(7) order the Defendants to pay Plaintiff costs and expenses and reasonable attorney's fees;
(8) grant such other relief to Plaintiff as the court deems just and proper.

Plaintiff's damages are in an amount sufficient to invoke the jurisdiction of this Court.

Case Number: PC-2023-04655
Filed in Providence/Bristol County Superior Court
Submitted: 9/20/2023 1:45 PM
Envelope: 4282335
Reviewer: Randie M.

Case 1:23-CV-00411-MSM-LDA    Document 1-1    Filed 10/06/23    Page 45 of 45 PageID #: 48

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands a trial by jury.

Plaintiff,
By his Attorney,

/s/ Carly Beauvais Iafrate
_____
Carly Beauvais Iafrate, #6343
Law Office of Carly B. Iafrate, PC
408 Broadway, 1st Fl.
Providence, RI 02909
(401) 421-0065
ciafrate@verizon.net